# IN THE UNITED STATES DISTRICT COURT FOR THE

# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ERNEST DILLMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-07-1104-D |
| | ) | |
| BILL WINCHESTER, as SHERIFF OF | ) | |
| GARFIELD COUNTY, and | ) | |
| THE BOARD OF COUNTY COMMISSIONERS | ) | |
| for the COUNTY OF GARFIELD, STATE OF | ) | |
| OKLAHOMA, a political subdivision of the | ) | |
| State of Oklahoma, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

Before the Court is the Motion for Summary Judgment [Doc. No. 23] filed by Bill Winchester, as Sheriff of Garfield County, Oklahoma. Plaintiff has timely responded to the Motion, and Winchester has filed a reply brief.

Plaintiff is a former employee of the Sheriff's Department of Garfield County, Oklahoma ("Sheriff's Department"). At all times relevant to Plaintiff's claims, Bill Winchester was the Garfield County Sheriff. Plaintiff brings this action pursuant to 42 U. S. C. § 1983, alleging that his constitutional rights were violated when his employment was terminated. Specifically, Plaintiff contends the defendants violated his First Amendment rights by terminating him after his criticisms of the Sheriff's office were published in the local newspaper. He also asserts a pendent state tort claim, pursuant to *Burk v. K-Mart Corp.*, 770 P. 2d 24 (Okla. 1989), alleging that his termination violated Oklahoma public policy. Both claims are also asserted against the Board of County Commissioners for Garfield County ("Board"). The Board has also filed a Motion for Summary Judgment [Doc. No. 24], and that motion is addressed in a separate order.

I. Summary judgment standard:

Summary judgment is proper where the undisputed material facts establish that a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one which may affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). To dispute a material fact, a plaintiff must offer more than a "mere scintilla" of evidence; the evidence must be such that "a reasonable jury could return a verdict" for him. *Id.* The facts and reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party. *MacKenzie v. City & County of Denver*, 414 F. 3d 1266, 1273 (10th Cir. 2005).

If the undisputed facts establish that a plaintiff cannot prove an essential element of a cause of action, the defendant is entitled to judgment on that cause of action. *Celotex*, 477 U.S. at 322. However, the defendant need not disprove the plaintiff's claim; the defendant must only point to "a lack of evidence" on an essential element of that claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F. 3d 664, 671 (10th Cir. 1998). The burden then shifts to the plaintiff to go beyond the pleadings and present facts, admissible in evidence, from which a rational trier of fact could find for him; conclusory arguments are insufficient, as the facts must be supported by affidavits, deposition transcripts, or specific exhibits incorporated therein. 144 F. 3d at 671-72. It is not the Court's responsibility to attempt to find evidence which could support the plaintiff's position. *Id.* at 672.

II. Application:

The following facts are established by the record before the Court. It is undisputed that Plaintiff was first hired by the Sheriff's Department in 2001 and resigned in 2004. In January, 2005,

he was hired by Winchester as a Day Shift Supervisor for the Sheriff's Department. At the time he was hired, Misty Taylor was the Assistant to the Jail Administrator; she was promoted to Jail Administrator in June of 2005. During Plaintiff's previous employment with the Sheriff's Department, he had worked with Taylor, and both had been inmate supervisors during that time. As Jail Administrator,Taylor became Plaintiff's supervisor.

In March of 2005, in anticipation of the opening of a new jail facility, Winchester promoted Plaintiff to the position of Facility Manager for the jail. Plaintiff's dep., Winchester Ex. 1, pp. 100-101. After the new facility opened in June of 2005, Winchester hired Randy Coleman as the Assistant to Jail Administrator Taylor; in that capacity, Coleman became Plaintiff's direct supervisor. Coleman and Plaintiff were friends. Winchester believed that Plaintiff had problems in dealing with Taylor as his supervisor. When he hired Coleman, he told Plaintiff that he hoped Coleman, as Plaintiff's direct supervisor, would be a "buffer" between Plaintiff and Taylor. Plaintiff's dep., Winchester Ex. 14, p. 49. lines 2-8.

Plaintiff was critical of Taylor's behavior and her management style. *See* January 6, 2006 notes submitted by Plaintiff, Winchester Exs. 10 and 11; January 27, 2006 note from Plaintiff, Winchester Ex. 12. On August 22, 2006, Taylor reprimanded Plaintiff for an issue involving poorly cleaned showers at the jail facility. Winchester Ex. 15. Plaintiff was upset, and complained to Winchester. August 24, 2006 Memo from Plaintiff, Winchester Ex. 16. Winchester believed the complaint was unwarranted. Plaintiff's dep., Winchester Ex. 1, p. 120, lines 10-20.

On July 18, 2006, Taylor circulated to the jail staff a memorandum advising them that, in the event of an incident involving inmates, "[a]ll inmates that are not involved will be locked down until after everything is taken care of." A copy of the memorandum is submitted as Winchester Ex.

17.    On August 9, 2006, an inmate created a disturbance and attempted to damage his cell.  In response, jailers  Jesus Hernandez and Jerry Cooper  entered the "pod" housing several inmates without locking down the other inmates or requesting back up before entering the pod.  A group of inmates confronted the jailers.   No serious injuries resulted.  Taylor wrote letters of reprimand  to Hernandez and Cooper because they failed to follow the July 18 lockdown policy.

After Taylor reprimanded Cooper and Hernandez, Coleman wrote a rebuttal to those reprimands and placed them in the personnel files of Hernandez and Cooper.   Coleman memorandum, Winchester Ex. 19.  According to an unsworn statement submitted by Cooper, he and Hernandez asked Coleman what they should do with their letters of reprimand, and Coleman told them to tear up the letters and throw away.  Cooper statement, Winchester Ex. 20.  At the direction of Winchester, Deputy Sheriff Rusty Duncan interviewed Cooper and Hernandez about this incident;  he submitted a written report stating that they told him Coleman instructed them to tear up the reprimands.  Duncan report, Winchester Ex. 21.  He was also told that Coleman told the jailers that the matter  had been taken care of as though it had never happened.  *Id.*

The record does not clearly explain what occurred during the August 9 incident that led to the reprimands of Cooper and Hernandez.  The memorandum written by Coleman states that he was not present at the time.  Winchester Ex. 19.  Nonetheless, he described it as an incident in which an inmate was damaging the cell; Cooper and Hernandez did not call for backup or lock down other inmates prior to entering the pod.  According to Coleman, when confronted  by other inmates, Cooper and Hernandez locked themselves in a separate cell and then called for backup.  *Id.*   Rather than criticizing their violation of policy, he thought they should be commended for their quick reaction to this incident.  Winchester Ex. 19.  It is not disputed that the Coleman memorandum was

placed in the personnel files of Cooper and Hernandez; the letters of reprimand from Taylor were not in their files.

When Winchester learned about Coleman's directions to Cooper and Hernandez to tear up the reprimands, he terminated Coleman. Winchester told Coleman that he was terminating him because he had removed the reprimands from the personnel files. Coleman told Plaintiff that this was the reason he was given for his termination. Plaintiff's dep., Winchester Ex. 14, p. 70-71; p. 72, lines 1-6; p. 83, lines 22-25; p. 84, lines 1-4.

Plaintiff was upset about Coleman's firing and believed Coleman was terminated without cause. That belief was based solely on his conversation with Coleman, who told Plaintiff he did not remove anything from the personnel files. Plaintiff's dep., Winchester Ex. 14, p. 23, lines 4-21; p. 24, lines 1-23. Plaintiff testified that he did not know if Coleman told Hernandez and Cooper to tear up their letters of reprimand; he also did not know what Hernandez and Cooper told Winchester about the letters and Coleman's statements to them. Plaintiff's dep., Winchester Ex. 14, p. 75, lines 4-8. He did not talk with them about Coleman's conduct or his termination; in fact, Plaintiff did not talk to Winchester about the reasons for Coleman's termination, and he did not discuss those reasons with anyone other than Coleman. Plaintiff's dep., Winchester Ex. 14, p. 25.

Plaintiff testified that he was aware of the July 18 policy requiring the lockdown of inmates if a disturbance was occurring, and he did not disagree with that policy; however, he testified that to require a lockdown when no disturbance was underway would be impracticable. Plaintiff's dep., Winchester Ex. 1, pp. 118-119. Plaintiff disagreed with Taylor's reprimands of Cooper and Hernandez because he did not think there was an ongoing disturbance when the jailers entered the pod without locking down other inmates. Plaintiff's dep., Winchester Ex. 14, pp. 16 and 19-20.

In his deposition, Plaintiff could not recall the date of the incident or the circumstances which caused Cooper and Hernandez to enter the pod. *Id.*, p. 15, lines 23-25; p. 16, lines 1-3.   The record reflects that Plaintiff was at the jail facility when  the incident occurred, but he did not witness it; his knowledge of the reasons Cooper and Hernandez went inside the pod is based on what he was told by others. *Id.*, p. 19, lines 2-22.

Although Coleman and Plaintiff did not directly witness the incident, Plaintiff testified that he and Coleman agreed the reprimands were not justified.  Plaintiff's dep., Winchester Ex. 14, p. 21, lines 17-24.  Plaintiff believed the reprimands constituted "playing favorites" by Taylor.  *Id.* at p. 20, lines 18-25.  However, Plaintiff also testified that the reprimands would have been justified if Cooper and Hernandez had entered the pod during a disturbance without following the July 18 policy. Plaintiff's dep.,  p. 18, lines 5-25; p. 19, lines 1-2; p. 21, lines 1-7.

 Plaintiff also testified  that, if Coleman had removed the reprimands from the files, it would be insubordination and would be cause for his termination; he also testified that, if Coleman had instructed Cooper and Hernandez to remove and destroy the reprimands from their files, that would also be cause for Coleman's termination.  Plaintiff's dep., Winchester Ex. 14, p.73, lines 8-14; p. 74; p. 75, lines 1-3.  Plaintiff also testified that, if Coleman had removed letters of reprimand from anyone's files, his termination would have been for cause.   *Id.* at p. 85, lines 4-17.   However, Plaintiff did not inquire further of anyone after  Coleman told him he did not remove anything from the files of Cooper and Hernandez; Plaintiff accepted that statement, and concluded that Coleman was wrongfully terminated.   *Id.*

Because he was upset about Coleman's termination and believed that it was related to Taylor's alleged incompetence, Plaintiff contacted Tippi Rust, a reporter with the Enid News, the

daily newspaper serving Garfield County. Plaintiff was interviewed by Rust, and his comments appeared in a September 2, 2006 article entitled "Jailer Says He Has Concerns." A copy is submitted as Winchester Ex. 23. The opening line of the article reported that Plaintiff, identified as the Garfield County Detention Facility manager, said he "is worried the public's safety is being compromised because of incompetent jail administration." According to the article, Plaintiff told the reporter that Randy Coleman was fired by Winchester "without cause" and that two other employees had resigned. Plaintiff was quoted as stating that there was a "safety issue" with the "administrator in charge," and the article paraphrased Plaintiff's report of an incident in which a jail trusty was "taken hostage briefly" in one of the jail pods. Plaintiff criticized the jail administrator[1] for not responding to the incident, and added that two jailers were cited for violating jail policy; Plaintiff stated that the jailers' conduct was "common practice" at the facility.[2] He also stated that the administrator was often out of the building attending college classes; he reported that, each time he expressed concerns about her, the Sheriff got angry and accused him of undermining her authority.

In the article, Winchester was also quoted in response to Plaintiff's statements; he said that the termination of Coleman and the other employee resignations had nothing to do with the jail administrator. The article also included statements made by County Commissioner Steve Hobson, who said he was aware of employee complaints about problems at the jail. Finally, the article reported that a recent Department of Justice inspection of the jail resulted in a finding that the

---

[1] *The article does not identify the jail administrator by name, but Taylor held that position at the time.*

[2] *Although no date is mentioned in the article, it appears that this incident is the August 9 occurrence which led to the reprimands of Cooper and Hernandez. The record contains no evidence of any other incident resulting in the reprimand of jailers.*

conditions are excellent. Commissioner Hobson told the news reporter that the Department interviewed employees, and the resulting report praised the Sheriff and his staff.

Winchester testified that he interpreted Plaintiff's statements to the news reporter as direct criticisms of his conduct as Sheriff, and interpreted them as "telling the paper that I was incompetent and my administration was incompetent and the public was at risk because of that." Winchester dep., Winchester Ex. 13, p. 5, lines 6-15. Winchester wrote a letter of reprimand, submitted as Exhibit 24, charging Plaintiff with insubordination based on public criticism, which he believed was the result of Plaintiff's personal antagonism toward his supervisors. He also believed that Plaintiff gave false information, and regarded his statements as slanderous toward Winchester. He added that the statements "could have an adverse impact on the jail and its staff as well as the Sheriff's Office. Your intention seemed to be to disrupt the workplace at the jail and create dissension between the Trust Authority and myself and with other supervisors and staff." Winchester Ex. 24. Winchester further stated "remaining at your position jeopardizes the work harmony, order and overall effectiveness and morale of the jail." *Id.* However, Winchester specifically added that, based on Plaintiff's "prior work here and the fact that I believe you to be a follower not a leader, you will be retained." Winchester Ex. 24. He advised Plaintiff that he would be reassigned to the night shift, and that his pay would be adjusted accordingly.

Winchester testified that he believed Plaintiff was influenced by others to make the statements to the news reporter, and he wanted to give him an opportunity to remain employed. Winchester dep., Winchester Ex. 13, p. 18, lines 22-25; p. 19, lines 1-7. He admitted that, in the new position, Plaintiff's salary was reduced. *Id.* at p. 19, lines 16-19. He also testified that, in his opinion, Plaintiff's statements were directed at Winchester because of the criticism of the jail

operation, as Winchester is ultimately responsible for its operation. Winchester dep., Ex. 13, p. 7, lines 22-23.

Plaintiff testified that, after he spoke to the newspaper, he believed he would be terminated, and he cleaned out his desk before he received Winchester's letter of reprimand. Plaintiff's dep., Winchester Ex. 14, p. 80. Although he agreed that the letter of reprimand did not terminate his employment, he believed that the reassignment to another position was, in effect, a termination. Plaintiff's dep., Winchester Ex. 14, p. 77, lines 18-25. However, he admitted that he had the choice of continuing his employment with the Sheriff's department; he chose not to do so. *Id.* at p. 78, lines 19-25.

After receiving the reprimand and reassignment, Plaintiff again contacted the Enid News reporter. A second article resulted from that contact. Winchester Ex. 25. The September 6, 2006 article reported that Plaintiff stated he was fired for making public accusations about the Sheriff's office; it also reported that Undersheriff Jerry Niles denied that Plaintiff was fired, and stated that Plaintiff was reassigned. Portions of the letter of reprimand were quoted in the newspaper article. Winchester Ex. 25.

It is undisputed that Plaintiff did not appear for work in his new position. Nor did he contact his assigned supervisor in the new position. According to Winchester, Plaintiff was ultimately terminated because he did not report for duty at his new position; Winchester testified that, in such circumstances, employees are considered to have "voluntarily quit." Winchester dep., Winchester Ex. 13, p. 12, lines 18-23.

A. Elements of a public employee's First Amendment claim based on freedom of speech:

The First Amendment protects public employees from adverse employment actions in

retaliation for their exercise of free speech. *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). To determine if a public employer impermissibly retaliated against a public employee in violation of his First Amendment rights, the court applies the test derived from *Pickering* and *Connick v. Myers*, 461 U.S. 138 (1983). Accordingly, to establish a *prima facie* case of First Amendment retaliation, the employee must show that his speech can be fairly characterized as relating to a matter of public concern and that his interests as a citizen outweigh the government employer's interest in promoting the efficiency of the public services it performs through its employees. *Pickering*, 391 U.S. at 568; *Dill v. City of Edmond*, 155 F. 3d 1193, 1201 (10th Cir. 1998).

The *Pickering* test has been modified by the Supreme Court. *Garcetti v. Ceballos*, 547 U.S. 410 (2006). In *Garcetti*, the Court determined that the context in which the employee's speech was made is an additional factor to be considered because "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 420.

Following *Garcetti*, the Tenth Circuit has adopted the following test to analyze the merits of a public employee's First Amendment claim: 1) the Court must first determine whether the employee spoke pursuant to his official duties;[3] 2) if not, then the Court must determine if his speech touches upon a matter of public concern; and 3) if so, the Court must balance the employee's interest in speaking about such matters against the interest of the public employer in promoting the efficiency of the public services performed through its employees. *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F. 3d 1192, 1202-03 (10th Cir. 2007).

_____

[3]*If the speech was made pursuant to the employee's official duties, the inquiry ends because the employee is not afforded First Amendment protection for such statements. Garcetti, 547 U.S. at 420.*

<u>1) Whether Plaintiff's speech was pursuant to his official duties:</u>

In this case, the parties agree that Plaintiff's statements to the newspaper were not made in the course of performing his official duties. Therefore, the initial prong of the *Garcetti* test is satisfied, and the Court must proceed to consider the remaining elements.

<u>2) Whether Plaintiff's speech involved matters of public concern:</u>

Winchester argues the undisputed facts establish that Plaintiff's statements to the newspaper did not involve matters of public concern. Instead, he contends that the statements reflected Plaintiff's grievances regarding the internal administration of the jail, personnel matters, and his disagreement with Taylor's manner of administering the jail. Plaintiff contends that he was concerned about safety, a topic of concern to the public.

Whether the speech involved a matter of public concern is a question of law. *Thomas v. City of Blanchard*, 548 F. 3d 1317, 1322 (10th Cir. 2008) (citing *Connick*, 461 U.S. at 148 n. 7). "To determine the threshold issue of whether an employee's speech addressed a matter of public concern, we look at the content, form, and context of a given statement as revealed by the contents of the record." *Burley v. Wyoming Dept. Of Family Services*, 66 F. App'x 763, 765 (10th Cir. 20030)(unpublished) (citing *Connick v. Myers*, 461 U.S. 138, 142 (1983)). The Tenth Circuit has identified the topics that constitute matters of public concern:

> [m]atters of public concern are those of interest to the community, whether for social, political or other reasons. Matters solely of personal interest to government employees, however, are not protected by the First Amendment. Although speech related to internal personnel disputes ordinarily does not involve public concern, speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials ... clearly concerns matters of public import.

*Dill v. City of Edmond*, 155 F. 3d 1193, 1202 (10th Cir. 1998). The analysis of public concern involves examining the statements at issue to focus on "the extent to which the content of the

employee speech was calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of government officials in the conduct of their official duties." *Koch*, 847 F.2d 1436, 1445; *see also Wulf v. City of Wichita*, 883 F.2d 842, 857 (10th Cir. 1989). The fact that the challenged speech relates to the operation of a government office does not, however, mean that it involves a matter of public concern. "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case." *Arndt v. Koby*, 309 F. 3d 1247, 1254 (10th Cir. 2002) (citing *Connick*, 461 U.S. at 149). Furthermore, the fact that the employee's statements were made to the media is not dispositive. "Media publicity of a dispute is not determinative of whether a pubic employee's speech was a matter of public concern." *Id.* (quoting *Lancaster v. Indep. Sch. Dist. No. 5*, 149 F. 3d 1228, 1233 (10th Cir. 1998). Instead, the proper focus is on the content of the speech, rather than the forum in which it was expressed. *Lancaster*, 149 F. 3d at 1233.

In this case, Plaintiff characterizes his statements to the newspaper as addressing matters of public concern because he told the newspaper that he believed a public safety issue was involved. According to Plaintiff's statements reported in the newspaper, he was concerned that the dismissal of three employees would have an adverse impact on jail administration and that the absence of personnel would create safety issues regarding the inmates.

However, the evidence in the record reflects that, although Plaintiff believed that Taylor was not competent, his statements to the newspaper were triggered by his concern about Coleman's termination and his belief, based solely on what Coleman told him, that it was without cause. He

admits that he contacted the newspaper two days after Coleman's termination.[4]  He now focuses, however, on Taylor and his belief that she "abused her position" by attending college classes, which required her absence from the jail. Plaintiff's brief in response to Winchester Motion, p. 6.

Winchester characterizes Plaintiff's statements as personal grievances resulting from his dislike of  Taylor and his reaction to the termination of Coleman, who was Plaintiff's friend. Winchester argues that Plaintiff's disagreement with Taylor's management style and the fact that she was allowed to attend college classes while retaining her position are internal personnel issues rather than matters of public concern.  Furthermore, Winchester testified that he approved Taylor's attendance at college classes, that she kept accurate time records, and that personnel knew how to contact her when she was away from the jail.  Winchester dep., Plaintiff's Ex. 1, pp. 33-34.

The Court's focus must be on the content of Plaintiff's statements to the newspaper, in the context of the circumstances leading up to those statements, to determine whether Plaintiff expressed matters of public concern or was discussing personnel matters about which he was concerned.  The Court has carefully reviewed the record and concludes that, although Plaintiff characterized his motivation as a concern for public safety, his statements were designed to criticize the termination of Coleman and the conduct of Taylor as jail administrator.  When asked about public safety, he expressed only the view that the jail administrator was incompetent; that is a matter regarding the personnel hired by Winchester to conduct the business of his office. Plaintiff's opinion of the abilities of the jail administrator, standing alone, does not equate to a public safety issue.  Further, Plaintiff made no allegations of corruption, malfeasance, or wrongdoing which rise to the level of public concern.   As noted by the Tenth Circuit in *Arndt*,

---

[4]*As Winchester points out, Plaintiff's statements were also made ten days after his August 22 reprimand by Taylor.*

all matters which transpire within a government office are not matters of public concern unless they expose wrongdoing or malfeasance. 309 F. 3d at 1254. The fact that Plaintiff's statements were of interest to a news reporter does not make them matters of public concern; as "media publicity of a dispute is not determinative of whether a public employee's speech was a matter of public concern." *Lancaster*, 149 F. 3d at 1233.

The Court concludes that the content of Plaintiff's statements to the newspaper, at the time they were made and in the context of the attendant circumstances, establishes that he did not speak about matters of public concern; instead, he sought to publicly voice his disagreement with Coleman's termination and his criticisms of Taylor. The content of his speech as a public employee is thus not protected by the First Amendment.

Even if the speech touched on matters of public concern, it is not protected by the First Amendment if Plaintiff's statements were false or were made with reckless disregard for their truth. Speech involving matters of public concern is not protected when "such statements are shown to have been made either with knowledge of their falsity or with reckless disregard for their truth or falsity." *Pickering*, 391 U.S. at 573;[5] *Dill v. City of Edmond*, 155 F. 3d 1193, 1202 (10th Cir. 1998)("deliberately or recklessly false statements do not receive First Amendment protection."). However, "inadvertently false speech on a matter of public concern may still provide a basis for a retaliatory discharge claim." *Craven v. University of Colorado Hosp. Authority*, 260 F. 3d 1218, 1229 (10th Cir. 2001) (citing *Pickering*, 391 U.S. at 572-73).

In this case, Winchester contends that some of Plaintiff's statements were false or were

---

[5]In *Pickering*, the Court concluded that the statements at issue, made by a public school teacher, were not knowingly or recklessly false; thus, the Court expressly declined "to pass upon the additional question whether a statement that was knowingly or recklessly false would, if it were neither shown nor could reasonably be presumed to have had any harmful effects, still be protected by the First Amendment." *Id.*at n.6.

recklessly made.  Plaintiff admittedly did not talk to Winchester about the reasons for Coleman's termination prior to contacting the newspaper and alleging that Coleman was terminated without cause.  In fact, Plaintiff did not discuss the termination or the reasons for it with anyone other than Coleman; he accepted Coleman's version of the events and concluded that Coleman was terminated without cause.   Plaintiff now argues, however,  his belief that the termination was without cause was confirmed as true because the Oklahoma Employment Security Commission ("OESC") awarded Coleman unemployment compensation after his termination.

The OESC decision is not dispositive of the issues raised by Winchester's motion.  As Winchester notes, OESC decisions are not binding upon this Court.  Okla. Stat. tit. 40 § 2-610.1. More importantly, however,  the issue decided by the OESC was not whether Winchester had cause to terminate Coleman, but whether Coleman was eligible for unemployment compensation. Winchester argued that Coleman was terminated for "misconduct," a finding that would render him ineligible for compensation.   The OESC decision was based on the issue of  "misconduct,"[6] as that term is applied  to OESC determinations.  The OESC found that Winchester did not prove that Coleman engaged in misconduct, as defined by the OESC,  because he did not prove that Coleman removed the letters of reprimand from the employees' files.  However, it did not conclude that there was no cause for his termination at the time the decision was made.[7]  OESC

---

[6]*The OESC  defines misconduct for this purpose as "willful or wanton disregard of an employer's interest" or "carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligation to his employer."*  <u>*Vester v. Board of Review of Oklahoma Employment Security Commission*</u>*, 697 P. 2d 533 (Okla. 1985).*

[7]*In fact, the OESC noted that there was circumstantial evidence that Coleman may have removed the letters of reprimand; it further determined that Coleman "probably did use poor judgment in writing what was in effect a 'counter-reprimand' and placing it in the files without authorization,"and that doing so "undercut the action of his supervisor." OESC Decision, Plaintiff's Ex. 2.*

Decision, Plaintiff's Ex. 2.    Plaintiff does not argue or present authority that a termination for cause requires the same finding of misconduct governing OESC decisions.  The issues before this Court are <u>not</u> whether Coleman was ultimately determined to be eligible for unemployment compensation or whether he engaged in misconduct as defined by the OESC, but whether Plaintiff expressed an opinion on a matter of public concern and/or spoke with reckless disregard for the truth when he told the newspaper that Coleman was terminated without cause. *Moore v. City of Wynnewood*, 57 F. 3d 924,   (10th Cir. 1995); *Wulf*, 833 F.2d at 858.

The issue of Coleman's termination is not a matter of public concern, as there is no contention that it involved malfeasance, corruption, or other wrongdoing.   In any event, Plaintiff admittedly did not talk with anyone other than Coleman before concluding that Coleman's termination was without cause and before reporting that allegation to the newspaper.  He did not attempt to determine Winchester's reasons for terminating Coleman.  He took no action to confirm Coleman's statements to him, and did not discuss these occurrences with Cooper or Hernandez.   Thus, even if Coleman's termination could be viewed as a matter of public concern rather than an internal personnel decision, Plaintiff acted with reckless disregard for the facts because he did not make any inquiries of others before  making a public allegation regarding Winchester's decision to terminate Coleman.

Nor did Plaintiff discuss with Winchester his allegations that the termination of Coleman and the resignation of two other employees left the jail with insufficient staff.  There is no indication that he expressed this concern to Winchester or that he even asked Winchester if he intended to hire a replacement for Coleman or the other employees.  In fact, the record reflects that Coleman was replaced with Randy Webb, who also assumed Plaintiff's position after he was

demoted.  Winchester dep., Winchester Ex. 13, p. 10, lines 14-25.  After Webb took a patrol position, another employee was placed in the position of deputy administrator and facility manager.  *Id.* at p. 11, lines 1-10.

The record further reflects that Plaintiff did not investigate the facts regarding the incident which led to the reprimands of Cooper and Hernandez, an incident he admits he did not personally witness.  Instead, he relied on what others told him, and concluded that Cooper and Hernandez did not deserve reprimands.  However, he admitted that, if they had violated policy, their reprimands would have been warranted.  He also criticized Taylor for her inaction regarding this incident, because he believed she should have sounded an alarm or taken some other action; again, however, he did not witness her conduct and bases his opinion on what might have occurred.  Plaintiff's Ex. 14, p. 51-52.

The Court concludes that Plaintiff's statements to the newspaper were recklessly made because he did not attempt to ascertain the facts prior to making accusations about incidents he admittedly did not directly witness and that he relied on untested statements of others to support his accusations.  The record reflects that, had he inquired further he would have determined that, at a minimum, Cooper and  Hernandez made statements contrary to Coleman's statements to Plaintiff.  Based on his own testimony, his opinion would have been different if he had further inquired about these incidents.  Similarly, his allegations about Taylor's absence from the jail to attend college classes were apparently made without regard to Winchester's knowledge and approval of her college attendance.

In summary, the Court concludes that the evidence in the record establishes that Plaintiff's statements to the newspaper were not an expression of opinion regarding matters of public concern

but were motivated by his disagreement with personnel decisions and the internal administration of the jail. Although he characterized his criticisms as involving public safety, he offered no evidence to support his view that the incidents about which he complained created a safety issue.[8] The Court concludes Plaintiff has failed to establish that his speech involved matters of public concern.

### 3) Balancing of interests:

Even if the Court had determined that Plaintiff established his speech involved a matter of public concern, the Court must balance the employee's right of expression against the governmental entity's interest in restricting speech. *Pickering*, 391 U.S. at 568. The governmental entity must articulate a basis for determining that restricting its employees' speech served the interest of promoting the efficiency of the services it performs through its employees. *Id.*

The required balancing of interests involves a factual analysis based on the record presented. *Brammer-Hoelter*, 492 F. 3d at 1202-03. The court must consider the "manner, time and place of the employee's expression." *Dill*, 155 F. 3d at 1203. An employee's First Amendment rights "may not be restricted 'unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee.'" *Id.* (quoting *Schalk v. Gallemore*. 906 F.2d 491, 496 (10th Cir. 1990)). "This requires Defendants to show 'actual disruption of services which results from the employee's speech.'" *Dill*, 155 F. 3d at 1203 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). The Tenth

---

[8] *The one incident mentioned by Plaintiff involved an alleged escape; the record reflects that this incident involved a jail trusty who left the premises after disposing of garbage while performing his duties as a trusty. Winchester dep., Plaintiff's Ex. 1, p. 41, lines 21-24. The date of this incident is unclear from the record, as Winchester did not recall if it occurred in 2005 or 2006. Id. There is no evidence that it was related to Plaintiff's expressed safety concerns.*

Circuit has recognized, however, that the government has a "strong interest in maintaining discipline and harmony among co-workers, especially where 'personal loyalty and confidence are necessary.'" *Id.* (quoting *Moore*, 57 F. 3d at 933). Furthermore, the Tenth Circuit has recognized that this interest is "particularly acute in the context of law enforcement, where there is a 'heightened interest...in maintaining discipline and harmony among employees.'" *Dill*, 155 F. 3d at 1203 (quoting *Moore*, 57 F. 3d at 934). In this regard, a governmental entity does not have to wait until the speech actually disrupts operations before taking action; in some cases, "predictions of harm" may justify restrictions on employee speech. *Moore*, 57 F. 3d at 934.

In this case, Winchester argues that, even if Plaintiff's statements were protected, they can nevertheless be restricted because of the need to maintain loyalty and harmony within the Sheriff's department. Where, as here, the focus of Plaintiff's comments is an allegation that jail administrators were incompetent, the possibility of dissension among staff presents a particular concern, and the Court agrees with the Tenth Circuit that a law enforcement agency has a heightened interest in maintaining discipline and harmony among its employees. The Court finds this particularly important in the present case because Plaintiff's comments to the press involved allegations that the jail administrator, who supervised staff, was incompetent.

Furthermore, the record reflects that Plaintiff was not terminated for making those statements; instead, he was assigned to another position in which he was not supervised by the individual he had criticized. That reassignment can reasonably be viewed as minimizing the risk of disruption in the jail operation resulting from Plaintiff's public criticisms.

For the foregoing reasons, the Court concludes that, even if Plaintiff's speech involved a matter of public concern, the required balancing of interests establishes that Winchester was

justified in restricting that speech. Accordingly, Plaintiff cannot satisfy this essential element of his claim.

    4)  Causal connection:

Inasmuch as the Court has concluded that Plaintiff's statements did not involve matters of public concern and are thus not protected by the First Amendment, the Court need not determine whether Plaintiff has shown a causal connection between his speech and his demotion.

    5) Conclusion regarding First Amendment Claims:

Having fully reviewed the parties' submissions and the governing law, the Court concludes that Plaintiff cannot establish a *prima facie* claim that his First Amendment rights were violated. Accordingly, Winchester is entitled to judgment on this claim, and his Motion is GRANTED.

C.  Plaintiff's pendent state law claim:

Plaintiff also asserts a pendent state tort claim against Winchester, alleging that he was terminated in violation of Oklahoma public policy and may assert a claim pursuant to *Burk v. K-Mart Corp.*, 770 P. 2d 24 (Okla. 1989). Winchester argues that, pursuant to the Oklahoma Governmental Tort Claims Act ("GTCA"), Okla. Stat. tit. 51 § 152.1, *et seq.*, he is immune from tort liability. The Court agrees. The GTCA provides immunity to a state employee, including an elected official, for conduct occurring in the scope of performing the duties of his office. Okla. Stat. tit. 51 § 153(B). Plaintiff's evidence is insufficient to show that Winchester's conduct was outside the scope of his duties as the elected Sheriff of Garfield County. The Court's findings regarding the propriety of his conduct in connection with Plaintiff's demotion preclude a finding that Winchester acted outside the scope of his employment. Accordingly, he is entitled to judgment as a matter of law on Plaintiff's state tort claim.

III.  Conclusion:

For the foregoing reasons, Defendant Winchester's Motion for Summary Judgment [Doc. No. 23] is GRANTED.  Judgment shall be entered in favor of Winchester and against Plaintiff on all claims asserted by Plaintiff in this action.

IT IS SO ORDERED this  9th  day of June, 2009.


_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE